# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Nicole Thompson,

    Plaintiff

v.

TRW Automotive, Inc.,

    Defendant

2:09-cv-1375-JAD-PAL

**Order Denying Motion for Judgment as a Matter of Law or for New Trial, and Granting Motions to Amend the Judgment to Account for Costs, Interest, and Setoff; Final Amended Judgment**

[ECF 328, 335, 336, 339]

Nicole Thompson sustained serious permanent injuries when her 1998 Dodge Neon was sideswiped, sending her through a road-construction zone and head on into a power pole.  She resolved her claims against the at-fault driver, the road-construction company, and her seatbelt's manufacturer.[1]  After a 17-day trial, the jury awarded Thompson $3.35 million against TRW Automotive, Inc., the designer and manufacturer of her car's air-bag–control module.[2]

TRW renews its motion for judgment as a matter of law and alternatively moves for a new trial.  It argues that the court applied the wrong standard for causation in this products-liability case, the evidence did not support the verdict, and juror misconduct tainted the verdict.[3]  It also moves to reduce the judgment by offsets for settlements paid by the other tortfeasors.[4]  Thompson vehemently opposes the motion for judgment as a matter of law or for a new trial, argues that a full offset is not warranted because she did not pursue all of her damages against TRW and her parents were beneficiaries of some of those settlement funds, and she seeks costs of $104,380.63 plus pre- and

---

[1] ECF 337, 357.

[2] ECF 318.

[3] ECF 339.

[4] ECF 336.

post-judgment interest.[5]  TRW does not dispute Thompson's entitlement to interest but objects to her cost request as excessive and not legally authorized.[6]

Having carefully reviewed the full record of this case, I conclude that the causation standard applied was an accurate statement of Nevada law, that TRW has not demonstrated that the evidence was too deficient to support the jury's verdict, and that juror misconduct does not dictate a new trial. I grant TRW's request for an offset and Thompson's motion for pre-and post-judgment interest.  I thus reduce the judgment by the full amount of the settlements from other tortfeasors and then add $37,618.43 in retaxed costs plus $352,505.42 in prejudgment interest, for a total post-judgment-interest–accruing judgment of $3,065,123.85.

## Procedural History

On April 27, 2007, 19-year-old Nicole Thompson was driving a 1998 Dodge Neon in Las Vegas, Nevada, when another vehicle swerved into her lane and struck the side of her car.  The force of the collision caused Thompson's vehicle to veer through a road-construction zone, hop the curb, and slam head on into a power pole.  The air bags did not deploy.  Thompson suffered a carotid artery dissection and a stroke—a traumatic brain injury that left her with partial right-side paralysis and disabilities—back injuries, and various cuts, scrapes, and bruises.

Thompson filed suit in Nevada state court against the at-fault driver and the road-paving company working on the stretch of road where the accident occurred.[7]  Thompson resolved those claims with good-faith settlements in 2007 and 2008.[8]  She filed this now-removed suit separately against air-bag–control-module designer and manufacturer TRW and seatbelt manufacturers Autoliv Safety Technology, Inc., and Autoliv ASP, Inc. (collectively, Autoliv), asserting various products-

---

[5] ECF 335, 346, 347, 349, 350.

[6] ECF 328, 335, 341, 343.

[7] *See* ECF 336-2.

[8] ECF 336-4 at 3, 336-6, 336-7.

liability and tort theories.[9]  Thompson settled her seatbelt claims with Autoliv in 2011.[10]  By the time this case went to trial against the last remaining defendant TRW in July 2014, only a single strict-products-liability claim remained.[11]

On the eve of trial, plaintiff's counsel announced their belief that, because the only claim left was one for strict products liability for their air bag electronic control module (AECM), they intended to prove the claim based on the consumer-expectations test, which meant all that mattered was Thompson's expectation about when her air bag would deploy.[12]  TRW responded that the court should instead employ the risk-utility test recognized in other jurisdictions.[13]  The court found that neither approach was consistent with Nevada's law as articulated by the Nevada Supreme Court when adopting the strict-liability doctrine in *Ginnis v. Mapes Hotel Corp.*: strict liability applies when the product (1) "failed to perform in the manner reasonably to be expected in light of its nature and intended function" and (2) "was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community."[14]

During the 17-day trial, the jury heard from plaintiff, her friends and family, the officer on the scene of the crash, seven doctors, three air bag experts, two seatbelt experts, four biomechanical and accident-reconstruction experts, two vocational rehabilitation experts, a life-care planner, and two economists.  TRW's theory of defense was that its air bag system worked perfectly: it was designed not to deploy in a crash like this one in which the various impacts before the final car-meets-pole impact could have jostled the driver out of her proper seat position and left her too close to the air

---

[9] ECF 1-1.  Thompson filed a separate lawsuit against the vehicle's manufacturer, Chrysler, in Nevada state court, which was stayed due to Chrysler's bankruptcy filing.  ECF 183 at 24.

[10] ECF 74, 79.

[11] ECF 312 at 13 (jury instruction #12).

[12] ECF 255, 261, 262.

[13] ECF 257, 261.

[14] *Ginnis v. Mapes Hotel Corp.*, 470 P.2d 135, 138 (Nev. 1970).  *See* ECF 312 at 15 (jury instruction #14).

bag for its safe deployment.[15]   At the close of the plaintiff's case, TRW unsuccessfully moved for judgment as a matter of law, arguing no causal connection between the air bag design and Thompson's injuries, that its product is not defective, and that none of plaintiff's damages were caused by a defect in the AECM.[16]

TRW renewed its arguments in a motion for judgment as a matter of law at the close of all the evidence; I denied that motion, too.[17]   The jury returned a unanimous verdict in favor of Thompson and awarded her:

- $861,675 in past pain, suffering, disability, and quality-of-life impairment;
- $1,011,675 in future pain, suffering, disability, and quality-of-life impairment;
- $965,000 in past medical expenses;
- $100,000 in future medical expenses;
- $154,000 in lost earnings through trial;
- $132,650 in future lost earnings; and
- $75,000 in future non-medical expenses,

for a total award of $3.35 million.[18]   Judgment was entered.[19]   Thompson filed a bill of costs for $104,380.63, to which TRW objects.[20]   Thompson and TRW have filed competing motions to amend the judgment: Thompson seeks pre- and post-judgment interest;[21] TRW wants an offset for monies Thompson received from settlements with the at-fault driver, the road-construction company, and

---

[15] ECF 268 at 40–41, 43, 49, 55,  57, 61, 63, 79–80 (transcript of opening statements).

[16] ECF 281 (motion), 282 (response), 286 (minutes).

[17] ECF 299 (motion), 304 (response), 309 (minutes), 342 (hearing transcript).  I did not issue a written opinion.

[18] ECF 318 at 2; 322 (amended judgment).

[19] Id.

[20] ECF 328 (bill), 341 (objection), 346 (response to objection).

[21] ECF 335.

1   Autoliv.[22]  TRW has also renewed its motion for judgment as a matter of law and alternatively asks

2   for a new trial.[23]  I resolve all of these post-trial motions with this omnibus order.

3                                            **Discussion**

4   **A.      TRW's motion for judgment as a matter of law and for a new trial  [ECF 339]**

5          After judgment was entered, TRW timely[24] renewed its motion for judgment as a matter of

6   law and added an alternate motion for a new trial.  By its renewed motion, TRW re-urges its original

7   causation and insufficiency-of-the-evidence arguments that failed to prevent the case from going to

8   the jury.  To those, TRW adds the argument that it is alternatively entitled to a new trial because the

9   jury's findings are against the clear weight of the evidence, the court should have instructed the jury

10  that the risk-utility test governs TRW's liability, the damage award was excessive, and a juror's

11  admission in a post-trial interview by defense counsel that she checked whether her own car's seat

12  belt would lock if she applied the brake quickly was jury misconduct that requires a new trial.[25]

13  Thompson opposes the motion.[26]

14         *1.      TRW has not demonstrated that it is entitled to judgment as a matter of law.*

15         Under Federal Rule of Civil Procedure 50(a)(1), judgment as a matter of law is appropriate

16  when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable

17  jury would not have a legally sufficient evidentiary basis to find for the party on that issue." [27]  The

18  court must consider whether "substantial evidence" supports the jury verdict,[28] "view all evidence in

19  the light most favorable to the nonmoving party, draw all reasonable inferences in favor of the non-

20  _____

21  [22] ECF 336.

22  [23] ECF 339.

23  [24] Fed. R. Civ. P. 50(b) allows the renewed motion within 28 days of the entry of judgment.  TRW
    renewed its motion on the 27th day after judgment.  *See* ECF 321, 339.

24

25  [25] ECF 339.

26  [26] ECF 347, 349.  TRW filed a reply at ECF 353.

27  [27] Rule 50(b).

28  [28] *See Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013).

1   movant, and disregard all evidence favorable to the moving party that the jury is not required to

2   believe."[29]  In short, the court should set aside the jury verdict and enter judgment in favor of the

3   non-prevailing party if the evidence "permits only one reasonable conclusion, and that conclusion is

4   contrary to the jury's verdict."[30]

5                    ***a.      Sufficient evidence supports the verdict.***

6          TRW first argues that the jury lacked evidence to link Thompson's injuries and damages to

7   TRW's product.  TRW's argument has two parts: (1) but-for causation was the proper test to

8   determine TRW's liability but the court improperly rejected TRW's but-for causation instruction and

9   instead gave a substantial-factor instruction, and (2) under either theory, the jury lacked evidence that

10  Thompson's injuries were caused by the AECM's suppression of the air bag during this crash.

11                   ***i.      The substantial-factor causation instruction was proper.***

12         After the close of all evidence, I instructed the jury that "A legal cause of injury, damage,

13  loss, or harm is a cause that is a substantial factor in bringing about the injury, damage, loss, or

14  harm."[31]  TRW argues that the jury should have been given the but-for causation instruction instead

15  because the parties' case theories were mutually exclusive, and Thompson's injuries could only have

16  resulted from one of those theories, not both.[32]  Thompson responds that Nevada's products-liability

17  jurisprudence makes it clear that the substantial-factor instruction was proper.

18         The Nevada Supreme Court clarified in *Wyeth v. Rowatt*[33] that one of two causation

19  instructions may apply depending on the parties' theories.  "A but-for causation instruction applies

20  when each party argued its own theory of causation, the two theories were presented as mutually

21  exclusive, and the cause of the plaintiff's injuries could only be the result of one of those theories,

22

23  [29] *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014).

24  [30] *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

25  [31] ECF 312 at 16 (jury instruction 15).

26  [32] *Wyeth v. Rowatt*, 244 P.3d 765, 778 (Nev. 2010).  *See also* ECF 250 at 37 (TRW's proposed jury
27  instructions); ECF 258 at 9–11 (plaintiff's objections to defendant's proposed jury instructions).

28  [33] *Wyeth v. Rowatt*, 244 P.3d 765, 778 (Nev. 2010).

but not both."[34] "A substantial-factor causation instruction is appropriate when 'an injury may have had two causes, either of which, operating alone, would have been sufficient to cause the injury.'"[35]

The causation theories in *Wyeth* were mutually exclusive. The plaintiffs claimed that Wyeth's hormone-therapy drug caused their breast cancer; Wyeth rebutted that claim with evidence that science has not yet determined what causes cancer.[36] Thus, the Nevada Supreme Court held that the trial court should have given the jury the but-for causation instruction but found the trial court's use of the substantial-factor instruction instead was harmless because the jury's conclusion was supported with scientific evidence.[37]

The causation theories in this case were not so streamlined. Thompson's theory was that she was wearing her seatbelt; it somewhat malfunctioned—a possibility that air bag-designer TRW should have foreseen—but still kept her far enough from the steering wheel that the air bag's deployment would have saved her from hitting the sun visor; it was the sun visor impact that caused the movement of her head that severed her carotid arteries and wrenched her back.[38] TRW claimed that Thompson was not wearing her seatbelt at all; thus she was bouncing around the car's interior and her chest was up against the steering wheel when she collided with the pole; had the air bag deployed into her chest, she could have been even more seriously injured. And her artery dissection occurred not because she hit her head on the visor when her car struck the pole, but because she bumped her chin on the steering wheel as her car jumped the curb while heading toward the pole. Thus, TRW, theorized, the carotid-artery injury had occurred even before the pole collision; so even if the air bag had deployed on that impact, it would not have prevented Thompson's most serious

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* at 778–79.

[38] ECF 268 at 13–14 (transcript of opening statements).

1  injury.[39]  The incorporation of the seatbelt, the sun visor, and the steering wheel complicated the

2  causation theories far beyond those encountered by the Nevada Supreme Court in *Wyeth* and

3  qualifies this case as one in which "an injury may have had two causes, either of which, operating

4  alone, would have been sufficient to cause the injury."[40]  The substantial-factor instruction was

5  appropriate under *Wyeth*.

6       This conclusion is also consistent with the Nevada Supreme Court's observation in *Price v.*

7  *Blaine Kern Artista, Inc.*[41] that the plaintiff's job in a products-liability case is to "show that the

8  design defect in the product was a substantial factor in causing [her] injury"[42]:

9          if a tortfeasor inflicts injuries on a plaintiff that are identical to what
the plaintiff would have received notwithstanding some abstract defect

10          in the involved product, the manufacturer may be absolved of liability;
however, if the product defect was a substantial factor in producing the

11          injury, the manufacturer will be held liable.[43]

12  Accordingly, the substantial-factor test was the causation test that Nevada law dictated in this case,

13  and the court did not err in giving this jury instruction.[44]

14          ***ii.***     ***The jury had sufficient evidence of causation***

15       TRW next argues that, regardless of which causation standard applies, the evidence did

16  not support the jury's conclusion that Thompson's injuries were caused by a defect in TRW's

17  AECM.[45]  It notes that in a crashworthiness or injury-enhancement case like this one, expert

18  testimony—about "[o]ccupant movement, injury analysis," for example—is necessary because the

19

20  [39] *Id.* at 49–61.

21  [40] *Wyeth*, 244 P.3d at 778.

22  [41] *Price v. Blaine Kern Artista, Inc*, 893 P.2d 367, 370 (Nev. 1995).

23  [42] *Id.* at 370 (quoting *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 209 (N.Y. 1983)).

24  [43] *Id.*

25

26  [44] Even if the but-for test were the applicable one, the failure to give the but-for causation instruction
was harmless because, just as in *Wyeth*, there was sufficient evidence of but-for causation to support

27  the jury's verdict.  *See infra* § A(1)(a)(ii).

28  [45] ECF 339 at 8.

issues are complicated and often "far beyond an ordinary juror's understanding."[46]  That, of course, is why the jury listened to weeks of testimony from seven doctors, three air bag experts, two seatbelt experts, and four bio-mechanical and accident-reconstruction experts.  Plus, Nevada law has long recognized that causation may be proven with circumstantial evidence in products-liability cases.  "In this case, as in most cases, positive proof either way is not available.  Inferences must be drawn from the best available evidence produced by each side."[47]  "The credibility of that evidence" is left to the jury.[48]

The expert testimony and circumstantial evidence, when viewed in the light most favorable to Thompson, was more than sufficient to support the jury's conclusion that TRW's AECM design caused Thompson injuries beyond those she would have experienced had the bag deployed in this crash.  To establish these damages, Thompson had to show a nexus "between the design defect and the injury" and that she would not have suffered identical injuries anyway.[49]  Ample testimony during this 17-day trial from Thompson's air-bag–system-design expert Chris Caruso, her seatbelt expert Dr. Charles Benedict, her occupant-kinematics and injury-causation expert Dr. Peter Orner, her diagnostic radiologist Dr. Rajneesh Agrawal, and her spinal surgeon Dr. Mark Kabins, along with TRW's air-bag expert, Jeffery Pearson, more than supported the jury's conclusion that the air bag's failure to deflate was a defect that caused Thompson's lower back injuries and internal carotid artery dissection.[50]

---

[46] *Id*. at 9.

[47] *Jeep Corp. v. Murray*, 708 P.2d 297, 300 (Nev. 1985) (quoting *Shoshone Coca-Cola v. Dolinski*, 420 P.2d 855, 858 (Nev. 1966)).

[48] *Jeep Corp.*, 708 P.2d at 300 (citing *Stackiewicz v. Nissan Motor Corp.*, 686 P.2d 925, 927 (Nev. 1984)).

[49] *Price v. Blaine Kern Artista, Inc.*, 893 P.2d 367, 370 (Nev. 1995).

[50] TRW argues, and Thompson does not refute, that the air bag deployment had nothing to do with the knee injury she otherwise suffered.  ECF 339 at 19.  Thompson did not ask the jury to award her damages related to her knee injuries; she abandoned that portion of her claim before closing arguments.

For example, Dr. Benedict testified that puckering, cupping, and other marks on the seatbelt and its component parts, coupled with Thompson's physical condition after the accident shows she was wearing her seatbelt but, by the time she hit the pole, it had partially spooled out.[51]  He opined that Thompson stayed in her seat with some slight or minimal movement forward during the entire accident.[52]  Dr. Orner refuted the notion that Thompson had her chin over the steering wheel as her car hit the curb.  He testified that the restraint Thompson received from the partially working seatbelt, coupled with her own act of bracing herself with her hands and arms on the steering wheel kept her in position during the curb strike.[53]  In his opinion, it was "the hyperextension of her neck during" the pole-collision that was "the cause of the bilateral dissections of [Thompson's] carotid arteries."[54]

Caruso then testified that, based on Orner's testimony and his own expert knowledge of air bag systems, Thompson was far enough back in her seat at the time of pole impact for the air bag to have safely deployed.[55]  He testified to a reasonable degree of scientific and engineering certainty that TRW's AECM system was defective because it was designed not to deploy in this crash when it should have—and would have—safely done so.[56]  He further explained that front crush-zone sensors, which were the state-of-the-art design at the time Thompson's 1998 Dodge Neon was manufactured,

------

[51] ECF 269 at 117–120 (transcript of Benedict testimony).

[52] The transcript of this testimony was not ordered and lacks a corresponding docket number.  This testimony was given during day four of the trial on July 31, 2014.  The court kept copious notes of the witnesses' testimony and all other aspects of the trial and reviewed those notes in preparing this order.

[53] ECF 289 at 41–42, 52–55, 58–59 (transcript of Orner testimony); 347-15 at 3–4 (additional excerpts of Orner transcript).

[54] ECF 289 at 59.

[55] The transcript of this testimony was not ordered and lacks a corresponding docket number.  This testimony was given during day five of the trial on August 5, 2014.  A portion of this testimony is found at ECF 296 and at ECF 347-9 at 4.

[56] ECF 294, ECF 296 at 104–105, 145–49, and ECF 347-9 at 4 (excerpts of Caruso testimony).

1 would have permitted a timely deployment of the air bag.[57]  TRW's air-bag–systems expert Jeffrey

2 Pearson acknowledged that, had Thompson's car not experienced a series of smaller impacts before

3 the pole strike, the air bag would have deployed and provided her restraint, even if she weren't

4 wearing her seatbelt.[58]  Dr. Agrawal gave extensive medical testimony about how carotid-artery

5 dissections occur.[59]  And, finally, Dr. Kabins testified that he could "comfortably state within a

6 reasonable degree of medical certainty and probability" that the accident was "the proximate cause

7 of" Thompson's back injuries.[60]

8          TRW highlights additional testimony that supports its own causation theory or cuts against

9 Thompson's,[61] but its effort does not compel me to set aside the jury's verdict and enter judgment in

10 TRW's favor.  At best, the jury had evidence from which it could have drawn a contrary conclusion,

11 and the plaintiff presented sufficient evidence to support the jury's conclusion.[62]  But my job is not to

12 weigh this competing evidence, rather to determine whether Thompson met her burden.  I conclude

13 that she did.  Having reviewed the entire evidentiary record, viewed all the evidence and inferences

14 in the light most favorable to Thompson, and disregarded all evidence favorable to TRW that the

15 jury was not required to believe, I find that the jury had adequate evidence to support its causation

16 conclusion.

17          **b.      _TRW is not insulated from liability as a mere component-part supplier._**

18          TRW also contends that it is insulated from liability because it was merely a parts supplier

19

20  ─────────────────

21  [57] ECF 347-5 at 4–5.

22  [58] ECF 349-4 at 3–4.

23
24  [59] The transcript of this testimony was not ordered and lacks a corresponding docket number.  This testimony was given on August 12, 2014.

25  [60] ECF 331 at 34 (transcript of Kabins testimony).

26  [61] ECF 339 at 9–19.

27
28  [62] _See Castro v. County of Los Angeles_, __ F.3d __, 2015 WL 4731366, *2–3 (9th Cir. August 11, 2015).

who followed Chrysler's specifications when designing its AECM.[63]  To hold it liable for defective

design, TRW argues, "would amount to holding a non-designer liable for design defect.  Logic

forbids any such result."[64]  To make this argument, TRW primarily relies on *Home Furniture v.*

*Brunzell Constr. Co.*, a construction-contract case in which the Nevada Supreme Court held, "where

a contractor has followed the plans and specifications furnished by the owner . . . he will not be

responsible to the owner, at least after the work is completed, for any loss or damage which results

solely from the defects or insufficient plans or specifications."[65]

 I am not persuaded that Nevada law supports the application of this rule to this case.  The

Nevada Supreme Court has separated construction-defect law from products-liability law, holding in

*Calloway II*[66] that a home is not a "product" for products-liability purposes.[67]  The *Calloway II* court

reasoned  that "inferior workmanship, which leads to building deterioration, is not properly

addressed by tort law.  In such circumstances, the overriding policy of tort law, to promote safety, is

not implicated."[68]  When the Nevada Supreme Court has expressly recognized that products-liability

cases present different concerns than construction-contract cases, I decline TRW's tacit invitation to

absolve this air-bag–system designer and manufacturer from liability for Thompson's injuries based

on a 50-year-old construction-contract case.

 Even if I were to apply this rule, it would not save TRW from liability because the evidence

established that TRW was more than a mere component-part supplier.  The testimony of Caruso and

Pearson demonstrated that TRW made independent design decisions and established TRW's

---

[63] ECF 339 at 19–20.

[64] ECF 339 at 19 (quoting *Garrison v. Rohm & Hass Co.*, 492 F.2d 346, 351 (6th Cir. 1974)).

[65] *Home Furniture v. Brunzell Constr. Co.*, 440 P.2d 398, 401 (Nev. 1968).

[66] *Calloway v. City of Reno*, 993 P.2d 1259 (Nev. 2000).

[67] *See Olson v. Richard*, 89 P.3d 31, 34 (Nev. 2004) (citing *Calloway II*, 993 P.2d at 1272).

[68] *Calloway II*, 993 P.2d at 1269 (internal citations omitted).

1  extensive control over the design of this product.[69]  And as early as opening statements, TRW's

2  counsel made it clear that TRW designed the AECM using a secret algorithm it didn't "even share . .

3  . with the automaker."[70]  Finally, Pearson acknowledged that "it was the AECM that TRW

4  manufactured that controlled 100 percent the decision to deploy or not to deploy the air bags on that

5  particular moment on that particular day with Nicole Thompson[.]"[71]  Thus, TRW is not insulated

6  from liability in this case simply because it designed a component of Thompson's car.

7
8          **c.**      ***The seatbelt does not sever the causal link between TRW's product and***
               ***plaintiff's injuries.***

9         TRW next argues that it cannot be held liable for Thompson's head and neck injuries because

10  those injuries were caused by the seatbelt—either by Thompson's failure to wear it, or because she

11  wore it but it malfunctioned during the accident.[72]  First, there was substantial evidence that

12  Thompson was wearing her seatbelt.  Plaintiff's seat-belt expert Dr. Benedict opined that she was

13  wearing it.[73]  Thompson testified that she was wearing her seatbelt during the accident and always

14  wore her seatbelt.[74]  And her mother, sister, and sister's ex-boyfriend testified about Thompson's

15  unwavering habit of wearing her seatbelt.[75]  Thus, there was more than enough evidence to permit

16  the jury to conclude that Thompson was wearing her seatbelt during the accident.

17         TRW's argument that the malfunctioning-seatbelt theory also cuts off causation is belied by

18  the evidence.  TRW highlights Dr. Benedict's testimony that, had the retractor not spooled out,

19  Thompson "would not have experienced hyperextension of her head and neck," but the jury was not

20  _____

21  [69] *See, e.g.,* ECF 296 at 141–43.

22  [70] ECF 268 at 54.

23  [71] ECF 331 at 121:5-10.

24  [72] ECF 339 at 20–21.

25  [73] ECF 269 at 117–120 (transcript of Benedict testimony).

26  [74] ECF 347-11 at 8.

27
28  [75] Federal Rule of Evidence 406 permits habit evidence "to prove that on a particular occasion the
person . . . acted in accordance with the habit or routine practice."

1  obligated to consider that evidence.  Dr. Benedict is an electro-mechanical engineer, not a medical

2  doctor.[76]  The jury was well within its province to (1) rely instead on the testimony of Dr.

3  Orner—plaintiff's biomechanical expert—who testified that the seatbelt kept Thompson in position

4  in her seat and prevented Thompson from hitting the steering wheel "with a killing force"[77] and (2)

5  combine Dr. Orner's testimony with all other air-bag–operation evidence from Caruso and Pearson

6  to conclude that the deployment of the air bag would have prevented Thompson from moving

7  forcefully forward and incurring the head and neck injuries.[78]  The seatbelt evidence does not cut off

8  TRW's liability for Thompson's head and neck injuries.

9
10
        *d.*       ***There was sufficient evidence for the jury to find that TRW's AECM was***
                ***defective under Nevada law.***

11        TRW next argues that the jury could not have found its AECM defective because the

12  evidence clearly showed that the product performed exactly as it was designed and intended to.[79]

13  But that is not the test for a design defect.  I instructed the jury that "a product is unreasonably

14  dangerous if it failed to perform in the manner reasonably to be expected in light of its nature and

15  intended function, and was more dangerous than would be contemplated by the ordinary user having

16  the ordinary knowledge available in the community."[80]  This instruction is consistent with

17  longstanding Nevada law and mirrors Nevada's pattern jury instruction.  In *Ginnis v. Mapes Hotel*

18  *Corp.*, the Nevada Supreme Court recognized that a manufacturer may be strictly liable in tort when

19  it designs a product that fails "to perform in the manner reasonably to be expected in light of its

20  nature and intended function and was more dangerous than would be contemplated by the ordinary

21
22
23
---

24  [76] ECF 294 at 51, 53.

25  [77] ECF 347-10 at 5.

26  [78] *See, e.g.,* ECF 349-4 at 3–4 (Pearson testimony).

27  [79] ECF 339 at 21–25.

28  [80] ECF 312 at 15.

1    user having the ordinary knowledge available in the community."[81]

2           TRW argues that the court erred by refusing to give a risk-utility instruction that advised the

3    jury that "a product is unreasonably dangerous because of a design defect if it creates a risk of harm

4    to persons [that] is not outweighed by the benefits to be achieved from [its] design."[82]  This issue

5    was extensively addressed before trial.  In trial briefs, Thompson argued that the court should apply a

6    "consumer-expectations test" and that she did not need to present expert testimony about the

7    defective design of TRW's AECM—she could rely on her own expectations as a consumer of her

8    1998 Dodge Neon.[83]  TRW responded by demanding its risk-utility instruction.[84]  I rejected both

9    arguments and instructed the jury using the *Ginnis* statement of Nevada law as incorporated into

10   Nevada's pattern jury instructions.[85]

11          It appears that the Nevada Supreme Court has taken great strides to ensure that strict-liability

12   claims remain governed by the *Ginnis* standard.  Although this standard more resembles the

13   consumer-expectations approach employed by California courts[86] than the risk-utility approach

14   adopted by a handful of other jurisdictions,[87] Nevada has adopted neither of these approaches.  I

15   declined the parties' invitation to make new Nevada law.

16          I reached that conclusion because neither approach is consistent with the two-prong *Ginnis*

17   statement of products-liability law.  The consumer-expectations test plaintiff urged focuses only on

18

19   [81] *Ginnis v. Mapes Hotel Corp.*, 470 P.2d 135, 138 (Nev. 1970); *accord, Rivera v. Philip Morris,*
     *Inc.*, 395 F.3d 1142, 1150 (9th Cir. 2005) (applying Nevada law); Nev. Pattern J.I. 7.02, 7.03, 7.06.
20

21   [82] ECF 339 at 22; *see also* ECF 242.

22   [83] ECF 235 (plaintiff's trial brief on consumer-expectations test); ECF 242 (defendant's brief on risk-
     benefit test); ECF 255 (plaintiff's expedited motion to preclude TRW from presenting defenses,
23   witnesses, evidence, and testimony that exceeds the scope of the plaintiff's remaining products
     liability claim regarding consumer expectation); ECF 257 (response).
24

25   [84] ECF 242.

26   [85] ECF 312 at 13–15 (jury instructions 12–14).

27   [86] *See, e.g., Soule v. General Motors,* 882 P.2d 298 (Cal. 1994).

28   [87] *See* ECF 242 at 4 (collecting authority).

the second, consumer-expectation prong of *Ginnis*, ignoring whether the product performed in the manner reasonably expected in light of its nature and intended function.[88] The notion that the plaintiff can establish a products-liability claim based entirely on her own expectations as a consumer is belied by (1) the extra-jurisdictional authority that recognizes expert testimony is necessary even under the consumer-expectations test when the features and operation of the product are outside the lay juror's understanding[89] and (2) the Nevada Supreme Court cases that suggest expert testimony is relevant and admissible to prove the first prong of the *Ginnis* standard.[90] The Nevada Supreme Court's statement in *Robinson v. G.G.C., Inc.* that "The best way to determine if a defendant should have built a safer product is to let the jury hear all the evidence relating to the course of conduct of both the industry, and the particular manufacturer"[91] further suggests that, in Nevada, a plaintiff must prove more than merely the consumer's expectation to recover in a products-liability case. TRW also offered nothing to persuade me that the Nevada Supreme Court would or should adopt the risk-utility approach proposed by TRW.

Regardless, TRW did not require a risk-utility-test instruction in order to fairly present its risk-utility-type defenses. Through its own experts, TRW offered evidence that the AECM was a state-of-the-art design and that its suppression feature—which prevented the air bag from deploying when a series of impacts may have jostled the driver too close to the steering wheel for the benefits of the air bag to outweigh its dangers—was not unreasonably dangerous. All of this evidence

---

[88] *See* ECF 235 at 8 (plaintiff's second trial brief on product defect, arguing that "the jury in this case only needs to determine the minimum safety assumption within the everyday experience of ordinary consumers").

[89] *See, e.g., Show v. Ford Motor Co.*, 697 F. Supp. 2d 975, 985 (N.D. Ill. 2010) (collecting authority), *affd* 659 F.3d 584 (7th Cir. 2011)); *McCabe v. Amer. Honda Motor Co.*, 123 Cal. Rptr.2d 303 n.3 (Cal. Ct. App. 2002).

[90] *See Ginnis*, 470 P.2d at 413–14 (finding sufficient proof to justify strict-products-liability instruction based on admitted expert testimony); *Fyssakis v. Knight Equipment Corp.*, 826 P.2d 570 (Nev. 1992) (court reversed grant of summary judgment because plaintiff offered affidavit of safety expert who attested that soap dispenser could have been designed more safely, which "raised a genuine issue of act regarding a defect in the dispenser").

[91] *Robinson v. G.G.C., Inc.*, 808 P.2d 522, 527 (Nev. 1991).

permitted the jury to determine whether the AECM was defectively designed.  The *Ginnis* standard, as incorporated into Nevada's pattern jury instruction 7.06, provided TRW all the flexibility it needed to defend itself and its product design, so TRW was not prejudiced by the lack of a risk-utility instruction.  Unfortunately for TRW, the jury simply believed the several days worth of Caruso's testimony that the AECM design is defective[92] over the testimony of TRW's own experts, as the jury was entitled to do.  The jury was properly instructed on Nevada law and had substantial evidence to find that TRW's AECM was defectively designed.

> ### e.   The jury properly credited the testimony of Thompson's life-care planner.

TRW's final argument in its renewed motion for judgment as a matter of law is that there was insufficient evidence to support certain damages that Thompson's life-care planner Jeni Kostelac testified to.[93]  TRW specifically challenges any link between the AECM defect and Thompson's need for a gym membership, manicures and pedicures, community college tuition, and child-care expenses.[94]

TRW's myopic argument ignores the substantial evidence of Thompson's health-care providers including Doctors Lemper, Agrawal, Ross, and Selco who—along with Thompson, her mother, and sister—described Thompson's serious injuries resulting from the carotid-artery injury and the resulting stroke that left Thompson with a partially paralyzed hand, other physical and cognitive disabilities, and difficulty performing personal-care tasks.  The jury properly credited this testimony and combined it with Kostelac's.  Because the jury believed the substantial evidence that supported its conclusion that the AECM was defective and it was that defect that caused Thompson's carotid-artery dissection and back injuries, the jury could properly conclude that these challenged damages items were reasonably necessary.

The renewed motion for judgment as a matter of law is denied.

---

[92] ECF 294, ECF 296 at 104–105, 145–49, and ECF 347-9 at 4 (excerpts of Caruso testimony). Caruso testified on July 31, August 5, August 6, August 7, and August 22.

[93] ECF 339 at 25–26.

[94] *Id.*

1

>    **2.      *TRW is not entitled to a new trial.***

2    TRW next argues that it is entitled to a new trial.  Federal Rule of Civil Procedure 59(a)

3  permits a trial court to grant a new trial "on all or some of the issues . . . for any reasons for which a

4  new trial has heretofore been granted in an action at law in federal court."  Although no standard is

5  articulated in the rule,[95] courts have found new trials warranted when "the verdict is contrary to the

6  clear weight of the evidence" or "is based upon false or perjurious evidence," or when a new trial is

7  necessary "to prevent a miscarriage of justice."[96]  The Court of Appeals "will not reverse the denial

8  of a new trial motion if there was some reasonable basis for the jury's verdict."[97]

9

>    ***a.      There was a reasonable basis for the jury's verdict.***

10    TRW reframes several of its judgment-as-a-matter-of-law arguments as reasons for a new

11  trial.  They are no more persuasive with this new label.  The first of these arguments is TRW's

12  contention that the jury's causation and defect findings "are against the clear weight of the

13  evidence."[98]  TRW argues simply that "for all of the reasons TRW is entitled to JMOL, it is also

14  entitled, alternatively, to a new trial, and TRW incorporates its discussions above herein."[99]  And for

15  all the reasons I concluded that the jury had more than enough evidence to defeat TRW's motion for

16  judgment as a matter of law, I also reject this repackaged sufficiency-of-the-evidence charge.[100]

17

18

>    ***b.      The court's refusal to give TRW's proposed risk-utility instruction offers no
>    basis for a new trial.***

19    TRW's second retread argument is its objection to the court's refusal to give a risk-utility

20

---

21  [95]  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).

22
23  [96]  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 (9th Cir. 2000) (citation omitted).

24

25  [97]  *Molski*, 481 F.3d at 729.

26  [98]  ECF 339 at 27.

27  [99]  *Id.*

28  [100]  *See supra* §§ A(1)(a) and (d).

1  instruction instead of Nevada's pattern jury instruction for design-defect claims.[101]  TRW does not

2  actually argue that this perceived error justifies a new trial.  It merely states that it "briefed this issue

3  in its Trial Brief" on this topic and "incorporates its brief by reference."  Of course, TRW did not

4  argue in that pretrial brief that a new trial is now warranted.  But even if I overlook the absence of

5  this critical link from TRW's argument, I reject it.  Nevada law has not adopted the risk-utility test,

6  and I maintain that the instruction I gave was the proper statement of Nevada's products-liability

7  law.[102]

8                *c.*       ***TRW has not demonstrated that the jury's damages award was excessive.***

9            Next, TRW argues that the jury's damages award was possibly excessive because the jury

10  was not asked to separately calculate the damages it was awarding for the carotid-artery-dissection

11  injuries from the lower-back injuries.  Because it cannot be determined whether the jury was

12  awarding damages for the carotid artery/stroke injury, back injury, or both, the award may be

13  excessive.  I have concluded that there was sufficient evidence of causation to support the jury's

14  finding that TRW's AECM caused Thompson both types of injury.[103]  The testimony by Thompson's

15  medical-care providers and the medical bills submitted in evidence supported the jury's conclusion

16  that her damages met or exceeded these amounts.[104]  Indeed, Exhibit 25, which the parties stipulated

17  was an accurate summary of Thompson's medical bills showed that Thompson incurred

18  $1,092,530.97 in medical bills, excluding those from Lemper Pain Centers, Dr. Lemper, the Center

19  for Surgical Intervention, and Summerlin Outpatient Pharmacy.[105]  When those additional amounts

20

21  _____

22  [101] ECF 339 at 27–28.

23  [102] *See supra* § A(1)(d).

24  [103] *See supra* at § A (1)(a)(ii).

25  [104] *See*, e.g., 349-10 at 3–4 (Dr. Kabins's testimony about necessary future medical procedures and
26  related costs); *id*. at 6–8 (Dr. Kaplan's testimony about necessary future medical procedures and
   related costs); trial exhibits 25 (back-injury bills), 214 (Dr. Lemper's pain-management billings); *see*
27  *also* ECF 285 (stipulation regarding plaintiff's medical bills).

28  [105] Trial exhibits 25, 214, 215.

1   are added in, the total becomes $1,336,914.46.[106]  But the jury only awarded $965,000 in past

2   medical expenses,[107] a discount of more than $371,914.46.  Finally, plaintiff's economist Thomas

3   Carroll calculated Thompson's total damages at $7.8 million.[108]  The jury discounted that figure by

4   more than half.  TRW simply has not demonstrated that the jury's $3.35 million damages award was

5   excessive.

6              **d.       *Juror Number 6's seatbelt-operation test does not warrant a new trial.***

7          TRW's final argument for a new trial is that a juror's out-of-court experiment during trial

8   requires a new trial.[109]  TRW's counsel attests that, during post-trial interviews with jurors, Juror

9   Number 6 stated that "she drove her car and tried 'slamming on her brakes' to see whether her seat

10  belt would lock up.  She stated the seat belt did not lock" and she believed "her seat belt spooled

11  out."[110]  She "stated she believed Plaintiff's seat belt spooled out like it did" for her.[111]  TRW argues

12  that this experiment caused this juror to give "improper weight to plaintiff's injury causation

13  evidence" and requires a new trial.

14         In conducting their deliberations, "[j]urors have a duty to consider only the evidence [that] is

15  presented to them in open court."[112]  "Out-of-court experiments are plainly extrinsic evidence," and

16  they "must be evaluated to determine whether there is a reasonable possibility that they could have

17

18

19  _____

20  [106] ECF 285; trial exhibit 25.

21  [107] ECF 318 at 3.

22  [108] This testimony was provided during day 10 of the trial on August 13, 2014.  The transcript of that
23  testimony was not ordered.

24  [109] ECF 339 at 29.

25  [110] ECF 339-10 at 1–2 (Stoberski affidavit).

26  [111] *Id.* at 2.

27  [112] *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (quoting *Bayramoglu v.*
28  *Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)).

1  affected the verdict."[113]  This standard is similar to harmless error.[114]

2       The Ninth Circuit's opinion in *United States v. Navarro-Garcia* is illustrative of these

3  principles.  In *Navarro-Garcia*, the panel considered a juror's mid-deliberations experiment in which

4  she drove around with a 300-pound weight in the trunk of her own car to test a criminal defendant's

5  claim that she lacked knowledge that she was driving around with 344 pounds of marijuana in her

6  car.[115]  The juror "discussed the experiment with the rest of the jury when deliberations resumed,"

7  and shortly after that, the jury convicted the defendant on all counts.[116]  The Ninth Circuit panel

8  found that the juror's conduct, if true, would warrant a new trial.[117]

9

10            ***i.    The experiment produced only the kind of information within jurors'*** 
                          ***common knowledge.***

11       Juror Number 6's act of "slamming on her brakes" to see how her own seat belt performed

12  was undoubtedly an extrinsic experiment.  But there was no reasonable possibility that it could have

13  affected this verdict.  First, TRW does not suggest that Juror Number 6 reported her experiment or

14  her conclusions to any other juror for use in reaching its verdict.  The suggestion is merely that the

15  experience may have played into this lone juror's belief that Thompson was wearing her seatbelt.[118]

16       The type of information that Juror Number 6 gleaned from this experiment is part of the

17  everyday, personal experience that most jurors bring to their deliberations.  It is an axiom of the jury

18  system that jurors rely on their own personal experiences in their deliberations.  As the Ninth Circuit

19

20

21

—————————

22  [113] *Id.*

23  [114] *Id.*

24  [115] *Id.* at 819.

25

26  [116] *Id.*

27  [117] *Id.* at 823.

28  [118] ECF 339-10 at 2.

1   recognized in *Navarro-Garcia*, "50% of the jurors' time is spent discussing personal experiences."[119]

2   In *Rodriguez v. Marshall*, the Ninth Circuit held that a juror's self-created, mid-trial memory

3   experiment designed to test the accuracy of eye witnesses' abilities to "discern and recall the makes

4   and colors of cars on the side of the freeway" merely produced "'the kind of common knowledge

5   [that] most jurors are presumed to possess'" and are expected to bring "'to bear on the facts of the

6   case.'"[120]  Similarly, when Juror Number 6 slammed on her brakes as she drove to or from trial, she

7   was doing something she had likely done countless times in Las Vegas traffic.  This brief activity

8   pales in comparison to the deliberate act of the *Navarro-Garcia* juror recreating case-specific

9   conditions and sharing the results of her experiment with her fellow jurors for discussion.  Like the

10  memory experiment in *Rodriguez-Marshall*, Juror Number 6's misconduct merely produced the kind

11  of common knowledge that most jurors are presumed to possess and are expected to bring to bear on

12  the facts of the case.

13              ii.      *There is no reasonable possibility that the experiment affected the verdict.*

14  Even if this brake-slamming test gave Juror Number 6 knowledge beyond the type that

15  ordinary jurors bring to deliberations, I still cannot conclude there was a reasonable possibility that

16  the experiment affected the verdict because the jury was presented with overwhelming evidence that

17  Thompson was wearing her seatbelt during the accident.  Thompson testified she was wearing it.[121]

18  Thompson, her mother, her sister, and her sister's ex-boyfriend all testified that Thompson had a

19  habit of wearing a seatbelt.[122]  Seatbelt expert Charles Benedict opined that Thompson was wearing

20

21

22  [119] *Navarro-Garcia*, 926 F.2d at 821 (quoting Joan B. Kessler, "The Social Psychology of Jury

23  Deliberations," in The Jury System in America 69, 83 (R. Simon ed. 1975)).

24  [120] *Rodriguez v. Marshall*, 125 F.3d 739, 745 (9th Cir. 1997) (quoting *Hard v. Burlington Northern

25  R. Co*., 870 F.2d 1454, 1461 (9th Cir. 1989)).

26  [121] ECF 349-9 at 2 ("Q:  . . . Were you wearing your seat belt on the day of the collision? A. Yes.").

27  [122] This testimony was presented on August 7–8 (mother Shirley Dohra), August 13 (sister's ex-
    boyfriend Ben Roth), and August 14 (sister Jennifer Thompson).  Transcripts of this testimony were

28  not ordered and are not in the record.

her seatbelt and relied on trial exhibits 27 and 967c to corroborate that opinion.[123]  And Dr. Orner testified that something—possibly including "a partially functioning shoulder harness that spooled out"—held Thompson in her seat.[124]  Thompson testified—and medical records confirmed—that, immediately after the accident, she had bruising in places consistent with seatbelt restraint.[125]  In light of this substantial evidence that Thompson was wearing her seatbelt during the crash, I cannot objectively conclude that there is a "reasonable possibility" that Juror Number 6's brief brake/seatbelt-check test could have affected the verdict in this case.  And because these "allegations if true would not warrant a new trial," I find that no evidentiary hearing is required.[126]

     ***iii.***  ***The jurors were instructed to base their verdict on the in-court evidence.***

     One final note.  I clearly and carefully instructed the jurors immediately before they retired to deliberate that they must base their verdict only on the evidence presented during the trial.[127]  "A jury is presumed to follow" the court's jury instructions,[128] and TRW has offered no evidence to suggest that any juror ignored these instructions and based his or her verdict on the results of Juror Number 6's test instead of on the evidence at trial.  As the Ninth Circuit panel stated in *United States v. Bagnariol*, "[t]his fact alone might justify affirmance."[129]

---

[123] ECF 269 at 117–120 (transcript of Benedict testimony); ECF 349-8 at 3 (same); ECF 349-6 (medical records).

[124] ECF 349-2 at 3–4.

[125] ECF 349-7 at 3–4.

[126] *Navarro-Garcia*, 926 F.2d at 822.

[127] *See* ECF 312 at 2 (Instruction #1: ". . . It is your duty to find the facts from all the evidence in the case. . . . you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so at the very beginning of this trial."); ECF 312 at 4 (Instruction #3: "In reaching your verdict, you may consider only the testimony and exhibits received into evidence . . . .(4) Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.").

[128] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007) ("We presume that jurors follow the instructions.").

[129] *United States v. Bagnariol*, 665 F.2d 877, 889 (9th Cir. 1981).

1      In sum, TRW has not demonstrated that it is entitled to a new trial on any ground.  Its motion

2 for a new trial is denied in its entirety.

3 **C.**    **Thompson is entitled to costs, but not all that she requests. [ECF 328, 341]**

4      In her timely filed bill of costs, Thompson asks for an award of $104,380.63.[130]  TRW objects

5 to every category of costs she claims, chastising Thompson for "shoot[ing] for the moon" and

6 ignoring the substantiation requirements and narrow limits of FRCP 54(d).[131]  TRW's primary

7 objection is that Thompson seeks from it the costs she incurred—and stipulated to bear herself—in

8 her state case against the at-fault driver and the paving company.  Its secondary complaint is that she

9 seeks costs not recoverable under the rule and Ninth Circuit case law.  Thompson responds that it

10 would be unfair for TRW to get an offset for her recovery in that prior case but not bear a

11 coordinating obligation for her costs incurred.

12      Rule 54(d)(1) allows the court to award costs to a prevailing party "[u]nless a federal statute,

13 these rules, or a court order provides otherwise."[132]  There is a strong presumption that costs should

14 be awarded, and "a district court need not give affirmative reasons for awarding costs; instead, it

15 need only find that the reasons for denying costs are not sufficiently persuasive to overcome the

16 presumption in favor of an award."[133]  The losing party has the burden of showing why the court

17 should disallow requested costs.[134]

18      Nevertheless, "taxable costs are limited by statute and are modest in scope."[135]  As the

19 Supreme Court expressed when explaining in *Taniguchi v. Kan Pacific Saipan* the narrow scope of

20 _____

21 [130] ECF 328.

22 [131] ECF 341 at 1–2.

23 [132] Fed. R. Civ. P. 54(d)(1).

24
25 [133] *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003) (citing *Ass'n of Mexican-American Educators v. California*, 231 F.3d 572, 592-93 (9th Cir. 2000)).

26 [134] *Save Our Valley*, 335 F.3d at 945.

27
28 [135] *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997, 2006 (2012); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 925 (9th Cir. 2015); 28 U.S.C. § 1920.

costs taxable in federal actions, "Taxable costs are a fraction of the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators.  It comes as little surprise, therefore, that costs almost always amount to less than the successful litigant's total expenses in connection with a law suit."[136]  A party seeking costs must attach "an affidavit, made by h[er]self or h[er] duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."[137]  With these principles in mind, I turn to the individual cost requests and objections.

### 1.   Clerk fees

Thompson seeks $474 for clerk fees.[138]  TRW concedes that clerk fees are recoverable under 28 U.S.C. § 1920(1), but it argues that $148 of the requested fees are from the prior case to which it was not a party, and another $175 are pro hac vice application fees that the Ninth Circuit has held are not recoverable under the statute.[139]  Thompson concedes that the pro hac vice fees are not recoverable and withdraws that request, but she claims the remaining fees should be awarded.

Thompson is not entitled to an award against TRW for the clerk and service fees paid in the separate, earlier-filed action against the at-fault driver, the paving company, and Chrysler (2007 case #A-543613).[140]  The statute permits an award only of fees "necessarily incurred in the case."[141]  Because the Ninth Circuit has cautioned that the cost statutes must be narrowly construed,[142] the only logical conclusion is that Thompson cannot recover the costs she incurred in the separate state action

---

[136] *Taniguchi*, 132 S.Ct. at 2006.

[137] 28 U.S.C. § 1924; *see also*  local rules 54-1 through 54-15.

[138] ECF 328 at 1.

[139] ECF 341 at 5 (citing *Kalitta Air LLC v. Cent. Tex. Airborne Sys., Inc.*, 741 F.3d 955, 957-58 (9th Cir. 2013).

[140] ECF 341-1 at 1.

[141] 28 U.S.C. § 1924.

[142] *Kalitta Air*, 741 F.3d at 959.

1  to which TRW was not a party. I am unpersuaded by Thompson's argument that it would be unfair

2  to permit TRW to obtain an offset for the settlements she received in that case yet not bear the costs

3  of that suit. In dismissing those separate claims, Thompson stipulated that she would bear her own

4  costs of bringing those claims[143] I do not find it unfair to hold her to that promise now. Thompson's

5  claimed clerk fees will be reduced by $323, leaving her with an award of $151 in clerk fees under 28

6  U.S.C. § 1920(1).

7        **2.**     ***Service fees***

8         Thompson seeks $248 for service of the summons and subpoena,[144] which includes $168 in

9  fees to serve the earlier lawsuit on the defendants in that independent action and obtain records from

10  the police department.[145] Thompson relies on the "relatedness" of the earlier case to support her

11  entitlement to the process service costs; she also claims that the police-department records were

12  utilized by both sides' experts in this case.[146] For the reasons articulated above, I find that the service

13  fees from the earlier state case are not recoverable here. And Thompson never specifically

14  demonstrates that the police-department's records were "utilized" here and has thus failed to meet

15  her burden under § 1924 to show this expense was "necessary" in this case. I sustain TRW's

16  objection. Subtracting $66, $60, and $42 from $248 leaves only the $80 Thompson spent to serve

17  TRW with this lawsuit, which I now award.

18        **3.**     ***Transcript fees***

19         Thompson seeks $31,568.30 to reimburse her for fees spent on printed or electronically

20  recorded transcripts.[147] TRW first objects to $804.20 in deposition-transcript costs incurred in the

21

22  [143] ECF 341-2, 341-3.

23  [144] ECF 328 at 1.

24  [145] ECF 341 at 6.

25  [146] ECF 346 at 9.

26  [147] ECF 328 at 1. In its response, Thompson seeks to increase the amount of costs to

27  $31,952.85—apparently a "reduction" after accounting for a computational error in the first bill of costs. ECF 346 at 9-10. This apparent increase is not supported by a new affidavit, as required by §

28  1924 and this district's local rules. Thus she did not meet her burden to show her modified cost

1 Nevada case.[148]  I disallow those fees for the same reasons articulated above.  It next objects to

2 $3,059.05 in trial-transcript costs, arguing that, because they were neither requested by the court nor

3 prepared by stipulation, they violate Local Rule 54-3,[149] which states, "Transcripts of pretrial, trial,

4 and post-trial proceedings are not taxable unless either requested by the Court or prepared pursuant

5 to stipulation approved by the Court."  Nothing in Thompson's response demonstrates that either of

6 these requirements in Local Rule 54-3 was met.  The entire $3,059.05 is therefore disallowed.

7 TRW next objects to some entries for deposition transcripts, pointing out that Local Rule 54-

8 4 "only allows for the taxation of either an original or copy of a deposition transcript but not both."[150]

9 TRW argues that Thompson seeks recovery for both original and certified copies of the depositions

10 of Jeffrey Rochette, Frank Kiiskila, Jeffrey Pearson, Russell Brantman, Stanley Cohen, David

11 Weiner, Emma Vasquez, Michael Klima, Elizabeth Rephael, and Gregory Stephens.[151]  Thompson

12 contends that these costs reflect the costs of a single transcript, and that All American Court

13 Reporters (the reporting service Thompson's counsel "regularly uses") includes a certified copy of

14 the transcript with the original.[152]  I have reviewed Thompson's invoices and it appears that each of

15 the challenged depositions was reported by All American, and the invoices reflect a charge for one

16 transcript only.[153]  Thus, all of these deposition transcript costs are awardable—and now

17 awarded—in full.

18 TRW next objects to the inclusion of video-deposition expenses, which it argues are "outside

19

20

---

21 request is valid.

22 [148] ECF 341 at 6–7.

23 [149] Id. at 7 (citing ECF 328-3 at 50–66).

24 [150] Id.

25 [151] Id.

26

27 [152] ECF 346 at 10 & n.2.

28 [153] See ECF 328-3 at 24–26, 32–49.

1  the narrow, limited, and modest scope of § 1920, and as outside the scope of Local Rule 54-4."[154]

2  These costs include: $522.75 for Thompson's video deposition and $225 for a DVD of the

3  deposition, totaling $747.75.  Local Rule 54-4 allows "the reasonable expenses of a deposition

4  reporter and the notary or other official presiding at the deposition."  Other courts in this district have

5  concluded that deposition-videography services[155] and deposition videos[156] are not taxable.  I find no

6  reason to conclude otherwise under the narrow scope of the statutes and rules.  Accordingly, I

7  disallow the $747.75 in videography expenses.

8       TRW next objects that Thompson's invoice does not segregate transcription expenses from

9  video expenses—which pertained to the video depositions of Jeffrey Rochette and Frank

10  Kisskilla—or permit Thompson to recover the amount of video-room costs.[157]  In its itemization of

11  deposition expenses, Thompson lists: (1) $980.50 for Kiskilla's deposition on 10/8/2010; (2)

12  $944.50 for Rochette's deposition on 10/8/10; and (3) $1,749 for Rochette's deposition on 1/26/12;

13  (4) $1,178 for Rochette's deposition on 6/20/12; and (5) $940.60 for Rochette's deposition on

14  8/21/13.[158]  Thompson concedes that the Rochette and Kiskilla depositions both include a $25 charge

15  for VHS tape duplication, which Thompson concedes was erroneous and withdraws.  I reduce the

16  bill of costs by $50 for VHS duplication.[159]

17  _____

18  [154] ECF 341 at 7.

19  [155] *Sloan v. Country Preferred Ins. Co.*, 2015 WL 995128, at *3 (D. Nev. Mar. 5, 2015).

20  [156] *E.g.*, *Rubin v. Scotts Co. LLC*, 2014 WL 4635708, at *3 (D. Nev. Sept. 16, 2014).

21  [157] ECF 341 at 8 (citing ECF 328-3 at 16–18).

22  [158] ECF 328-3 at 1–2.

23

24  [159]  Additionally, while courts interpreting Local Rule 54-4 have found it does not permit taxation of
   cost for deposition room rentals, Thompson explains that the room rental charges were not included
25  in the computation of deposition costs.  ECF 346 at 13.  The invoices she submits include an 8/26/10
   statement for "room rental" apparently incurred for Kiskilla's deposition, for which $1,375 is
26  requested.  ECF 328-3 at 16-17.  Another invoice reflects a $1,250 room-rental bill, purportedly for
   Rochette's deposition.  ECF 328-3 at 18-19.
27

28       TRW also voices a general objection to any expenses incurred in arranging for the taking of a

1    In sum, TRW's successful objections have reduced the claimed $31,568.30 in transcript costs

2 by $3,059.05, $804.20, $747.75, and $50, leaving a sum of $26,907.30 in costs taxable in this

3 category.

4    **4.    *Printing costs***

5    Next, Thompson seeks $1,862.15 in printing costs.[160]   TRW first objects to $299.25

6 Thompson incurred for photographic enlargements, arguing that, while the enlargements in question

7 were either 32 x 48 or 42 x 60 inches in size, Local Rule 54-7 does not permit her to recover costs

8 for enlargements over 8 x 10 inches in size.[161]   TRW also objects to Thompson's request for $1,500

9 for high-impact demonstrative image copies, apparently because these charges also violate Local

10 Rule 54-7.[162]   Thompson does not dispute TRW's characterization of these items.  Instead she argues

11 that they were not designed to be admitted into evidence but "were for medical illustrations utilizing

12 Plaintiff's medical imaging, in order to demonstrate her injuries," and are awardable under 28 U.S.C.

13 §§ 1920(2) and (4).[163]

14    But 28 U.S.C. § 1920(2) offers Thompson no safe harbor.  This statute permits recovery only

15 for "printed or electronically recorded transcripts necessarily obtained in the case."[164]   Closer is 28

16 U.S.C. § 1920(4), which allows "fees for exemplification and the costs of making copies of any

17 materials where the copies are necessarily obtained for use in the case."  This statute is broader than

18 Local Rule 54-7, which deems the cost of photographs measuring 8 x 10 or smaller "taxable if

19 admitted into evidence or attached to documents required to be filed and served on opposing

20 counsel."  Rule 54-7 only permits taxation of larger photographs "by prior order of the court."

21 _____

22 deposition, which it argues are disallowed by Local Rule 54-4.  ECF 341 at 8.  Because TRW has not specified cost entries to which it is objecting, I decline to consider this additional argument.

23

24 [160] ECF 328 at 1.

25 [161] ECF 341 at 8.

26 [162] *Id.*

27 [163] ECF 346 at 13-14.

28 [164] *Id.*

1    Other courts have found enlargements taxable under 28 U.S.C. § 1920(4) when they were

2  enlargements of exhibits.[165]  Other courts interpreting § 1920(4) in the context of similarly worded

3  local rules have allowed the costs where they "aided the efficient and effective presentation of

4  complex evidence and were extremely helpful to the Court."[166]  I find that these demonstrative aids

5  were helpful in displaying Thompson's injuries to the jury, and I allow the full $1,862.15 as

6  requested.  TRW's objection in this regard is overruled.

7    *5.    Witness fees*

8    Thompson next seeks $25,322.54 in witnesses fees.[167]  TRW objects to the $22,939.87 for

9  expert-witness fees from the earlier state-court case.  Because I have found that Thompson may not

10  recover from TRW the costs she incurred in that separate, earlier state-court case, I disallow the

11  $22,939.87.[168]

12    TRW also objects to a portion of the $2,382.67 in witness fees in this case for Melissa

13  Plemmons (designated to testify at trial) and Lou Esposito (designated to testify by deposition).[169]

14  TRW contends that neither of these individuals was ever actually procured at the times requested.[170]

15    Under Local Rule 54-5, a witness need not have actually testified to recover associated costs

16  "if it is shown that the attendance was necessary, but if a witness is not used, the presumption is that

17  the attendance was unnecessary."  Thompson points out that TRW mentioned Plemmons in its

18

---

19  [165] *Harrington v. City of Portland*, 1990 WL 177406, at *4 (D. Or. Nov. 8, 1990).

20  [166] *In re Omeprazole Patent Litig.*, 2012 WL 5427791, at *6-7 (S.D.N.Y. Nov. 7, 2012) (citing
21  cases).

22  [167] ECF 328 at 1.

23  [168] Additionally, under 28 U.S.C. § 1920(3), the court may tax the losing party for witnesses, and 28
   U.S.C. § 1821(b) limits a witness to "an attendance fee of $40 per day for each day's attendance."
24  Federal law governs the reimbursement of both lay and expert witness fees, except in cases where
   recovery of costs is an element of substantive damages permitted under state law. *See Chalusen v.*
25  *M/V NEW CARISSA*, 339 F.3d 1049, 1064-65 (9th Cir. 2003).  This is not one of those cases, so
26  federal law governs.

27  [169] ECF 341 at 9-10.

28  [170] *Id.*

Page 30 of 40

opening statement and then attempted to mention her failure to testify again in its closing statement; the only reason this necessary witness was not called was because Thompson ran out of time.[171] Based on TRW's implied concession that Plemmons may have been "necessary," I find Thompson has met her burden to show that the fees and expenses related to this non-appearing witness should be awarded.

As to Esposito, Local Rule 54-4 provides that "[f]ees for the witnesses at the taking of a deposition are taxable at the same rate as for attendance at trial." Unlike Local Rule 54-5, however, Local Rule 54-5 does not specify what presumption, if any, attaches to the non-use of deposition transcripts at trial. Nevertheless, Thompson's sole argument for an award of these costs—"the fact that Mr. Esposito's deposition transcript was not used at trial does not otherwise negate the taxable nature of this cost"— fails to show how these costs were necessarily incurred.[172] Thus, I disallow the $30 fee Thompson requests for Esposito's deposition.[173]

After subtracting $22,939.87 and $30 from the $25,322.54 Thompson seeks for witness and expert fees, I award her $2,352.67.

### 6.    *Copy expenses*

The statute allows an award of "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."[174] Thompson claims $42,235.66 worth.[175] TRW objects to every dime.[176]

TRW first argues that the 35¢-per-page charge for black-and-white photocopies is

---

[171] ECF 346 at 15.

[172] ECF 346 at 15-16.

[173] *See* ECF 328-5 at 2.

[174] 28 U.S.C. § 1920(4).

[175] ECF 328 at 1.

[176] ECF 341 at 10.

1   unreasonable and should be reduced to the market price of between 10 and 14 cents.[177]  But TRW's

2   "market price" comes from a case out of the Northern District of Georgia.[178]  As Thompson notes,

3   the District of Nevada is nowhere near the Eleventh Circuit.[179]  Indeed, almost 30 years ago a Nevada

4   district court remarked, "Twenty-five cents per photocopy is a normal charge in this area by law

5   firms that itemize separately for photocopies when billing their fee-paying clients."[180]  It is not

6   unreasonable to conclude a black-and-white photocopy costs of 35¢ (and a color copy goes for $1) in

7   this market.

8        TRW also objects to $37,370.55 in miscellaneous office copy charges, arguing that

9   Thompson completely fails to show "which copies were furnished to counsel for TRW or Autoliv

10   without request" and that such categorical summaries lack sufficient detail to be awardable.[181]  In

11   response, Thompson states "[i]n the spirit of good faith" she has reduced this amount to $1,400.20,

12   which is now "limited to one copy of documents that were actually admitted into evidence, at the

13   rate of $.35 per black and while and $1 for color."[182]  Upon review of Thompson's entries, I find the

14   records reasonable with this reduction, and I decline to further reduce Thompson's already-reduced

15   $1,400.20 charge for in-office copy charges.

16        TRW next objects to Thompson's $3,456.85 in medical, tax, and police records, arguing that

17   she has not demonstrated why these copies were necessary for use in the case and attached to a

18   document filed and served.[183]  TRW also disputes Thompson's entitlement to expenses for copies

19

20

---

21   [177] *Id.* at 10-11.

22   [178] *Denton v. Daimlerchrylser Corp.*, 645 F. Supp. 2d 1215, 1228 (N.D. Ga. 2009).

23   [179] ECF 346 at 18.

24   [180] *Gorelangton v. City of Reno*, 638 F. Supp. 1426 (D. Nev. 1986).

25

26   [181] ECF 341 at 10.

27   [182] ECF 346 at 16.

28   [183] ECF 341 at 11.

1   obtained for use in the state-court case.[184]  Thompson responds that while these documents may have

2   been obtained for use in the prior suit, they were later turned over to TRW "to substantiate her

3   economic, medical and physical damages" and to "turn them over to opposing counsel in formal

4   discovery."[185]  Thompson has demonstrated that these costs were "necessary" in this case because

5   they were in fact provided in the form of written discovery.  TRW's objection in this regard is

6   overruled.

7        Finally, although TRW objects to the (now-reduced $1,408.26 in) record charges related to

8   the earlier case, it never specifies which charges it is concerned about.  For this reason, and also in

9   light of the drastic reduction plaintiff has volunteered, I decline to reduce these copy costs further.

10       In sum, of the original $42,235.66 requested, I award $1,400.20 in miscellaneous copy

11   charges and $4,865.11 in record costs, for a total of $6,265.31.

12       *7.    Other itemized costs*

13       Finally, Thompson seeks $2,669.98 in other miscellaneous itemized costs.[186]  TRW objects to

14   these requests in their entirety, arguing they do not fall within the categories of costs allowed by

15   statute and that Thompson has failed to show they were necessary in this case.[187]  Thompson

16   suggests that this court has discretion to award costs other than those explicitly enumerated and, as a

17   sophisticated litigant who was master of its own defense, TRW knew that Thompson would likely

18   send deliveries of litigation papers via federal express and incur expenses for long-distance phone

19   calls and fax transmissions.[188]  This may be so, but in light of the fact that cost recovery is modest

20   and narrow in scope, I find that my discretion is best exercised by denying the entirety of these

21   miscellaneous additional costs.

22

23   ———————————

      [184] *Id.*

24
      [185] ECF 346 at 16–17.
25
      [186] ECF 328 at 2.
26
      [187] ECF 341 at 12.
27
      [188] ECF 346 at 19.
28

1    The net result of these findings and conclusions is that TRW has succeeded in reducing

2  Thompson's cost award by $66,762.20.  Costs of $37,618.43 are taxed against TRW and in favor of

3  Thompson as follows:

| Category of Costs | Requested | Disallowed | Awarded |
|---|---|---|---|
| Clerk Fees | $474 | $323 | $151 |
| Service Fees | $248 | $168 | $80 |
| Printed or electronic transcripts | $31,568.30 | $4,661.00 | $26,907.30 |
| Printing | $1,862.15 | $0 | $1,862.15 |
| Witnesses | $25,322.54 | $22,969.87 | $2,352.67 |
| Copies | $42,235.66 | $35,970.35 | $6,265.31 |
| Other | $2,669.98 | $2,669.98 | $0 |
| **Total** | $104,380.63 | $66,762.20 | **$37,618.43** |

13  **D.    TRW's entitlement to an offset for other settlement recovery**

14    TRW moves to reduce the judgment by $675,000 to provide TRW an equitable offset for

15  aggregate settlement amounts that Thompson received from Eusebio Villatuya (the at-fault driver)

16  and Las Vegas Paving Co. (the road-construction company doing work at the accident scene) in the

17  separate state court lawsuit, and from Autoliv (the seatbelt manufacturer) in this case.[189]  TRW

18  primarily relies on Nevada's Uniform Contribution among Tortfeasors Act (UCTA), codified at NRS

19  17.245(1)(a).[190]  Thompson does not deny that some offset is justified.  She contends, however, that a

20  portion of her state-court settlement proceeds covers knee injuries that she did not claim at trial

21  against TRW, and she notes that a portion of the Autoliv settlement went to her parents—who were

---

[189] ECF 336 at 3.  Villatuya settled with Thompson on August 1, 2007; Las Vegas Paving settled on July 30, 2008.  ECF 336 at 2.  The state court judge deemed those settlements to be good-faith ones. ECF 336-4 at 27, 336-7 at 2.  Judge Philip Pro found Autoliv's settlement in this action to be in good faith in March 2011.  ECF 74.  This case was transferred to me in August 2013.  ECF 163 (minute order).

[190] *See id.* at 6-7.

1  her co-plaintiffs in the early stages of this action.[191]

2      NRS 17.245(1)(a) states that a good-faith settlement by "one of two or more persons liable in

3  tort for the same injury . . . reduces the claim against the others to the extent of any amount stipulated

4  by the release or the covenant, or in the amount of the consideration paid for it, whichever is the

5  greater."[192]  In *The Doctors Co. v. Vincent*, the Nevada Supreme Court explained how NRS

6  17.245(1) operates for a non-settling tortfeasor.  The court described the statute as "a form of

7  contribution as to prior settlements in good faith because such settlements under subsection 1(a)

8  reduce the claims against nonsettling tortfeasors by the amount of the settlement, i.e., through an

9  equitable set-off."[193]  One object of the statute is to "prevent double recovery to the plaintiff,"[194] so a

10 nonsettling tortfeasor is entitled to an equitable offset only for aspects of the judgment "that

11 mirror[]" the good-faith settlement.[195]

12              *1.    Medical benefits*

13     Thompson claims that TRW is not entitled to an offset for the nominal medical-benefits

14 payment she received from Las Vegas Paving.  She first argues that this portion of the settlement was

15 not included in the good-faith settlement determination, so TRW should not be able to get an offset

16 for it.[196]  But characterizing this payment as something outside the good-faith settlement does not

17 disentitle TRW to an offset for this benefit because offsets are equitable in nature.  Nor am I

18 persuaded by Thompson's argument that the medical-benefits payment covers her knee injuries and

19 related surgery—damages she did not seek against TRW at trial—so TRW gets no benefit for them.

20 Thompson offers nothing to demonstrate that any portion this medical-benefits payment was

21

---

22  [191] ECF 343.

23  [192] Nev. Rev. Stat. § 17.245(1)(a).

24

25  [193] *The Doctors Co. v. Vincent*, 98 P.3d 681, 690 n.31 (Nev. 2004).

26  [194] *Banks ex rel. Banks v. Sunrise Hosp.*, 102 P.3d 52, 67 (Nev. 2004).

27  [195] *W. Technologies, Inc. v. All Am. Golf Ctr., Inc.*, 139 P.3d 858, 862 (Nev. 2006).

28  [196] ECF 350 at 2-3.

1   earmarked for knee injuries, and I cannot conclude that the funds were even used for that purpose

2   because they remain in her attorney's trust account and have not been used at all.[197]  Thus, I find no

3   reason to disallow TRW the benefit of an offset in the full amount of the state-court settlements.

### 2.   *Allocation to Thompson's parents*

5   I next consider the portion of the Autoliv settlement allocated to Thompson's parents.

6   Whether their claims had any value or not, Shirley and Dennis Thompson were parties to the Autoliv

7   settlement agreement,[198] and Thompson has demonstrated that they received only a portion of the

8   confidential settlement amount.[199]  Because Thompson's parents were not parties at trial, and the

9   judgment that Thompson received does not include any amounts for them, I typically would not find

10  that equity supports TRW's receipt of an offset for their portion of the Autoliv settlement.

11  But that's not the end of this story.  In order to ensure that the good-faith-settlement

12  determination went through, Thompson stipulated that TRW would receive a setoff for the entire

13  amount of the Autoliv settlement:

14
15          the parties hereby stipulate that a setoff equal to the amount of the
             confidential settlement between Plaintiffs and Autoliv be applied to
             any verdict the Plaintiff may obtain against TRW when the case is
16          tried.[200]

17  The court signed the stipulation, vacated the good-faith-settlement hearing, and entered the order

18  deeming the settlement to be in good faith under NRS 17.245.[201]  By the time of the Autoliv

19  settlement, Thompson's parents' claims had been dismissed on summary judgment, and an appeal of

20
21
22  _____

23  [197] *Id.* at 3.

24  [198] *See* ECF 64 (joint motion for good-faith-settlement determination).

25  [199] The Confidential Settlement Apportionment that reflects this allocation was submitted for my *in*
26  *camera* review.  *See* notice at ECF 351.

27  [200] ECF 72.

28  [201] *Id.*

1    that order was pending.[202]  The parties' use of the plural "plaintiffs" when referring to the settling

2    parties in the stipulation, and the singular "plaintiff" whose claims might ultimately proceed to trial

3    against TRW suggests that no one believed Shirley and Dennis were actively litigating parties at the

4    time the stipulation was agreed to, and the stipulation was entered to ensure that TRW would receive

5    an offset for the entire settlement amount, not just Nicole Thompson's portion.  Thus, TRW is

6    entitled to an offset in the full amount.

7    **E.    Pre- and post-judgment interest [ECF 335]**

8            Thompson also asks the court to amend the judgment to include an award of pre- and post-

9    judgment interest.  She claims she is entitled to prejudgment interest on her past damages of

10   $1,980,675[203] at a rate of 5.25% from the time of service of complaint through the entry of clerk's

11   judgment on August 28, 2014.[204]  She requests that the court then add to the entire judgment amount

12   (which would include the verdict amount, pre-judgment interest, and costs) post-judgment interest at

13   a rate of 11%, computed daily and compounded yearly.[205]  TRW does not dispute Thompson's legal

14   entitlement to pre- and post-judgment interest.  It only asks that the court first deduct the full

15   settlement offset from the $1,980,675 before calculating pre- and post-judgment interest.[206]

16   Thompson filed no reply.

17           I find that Thompson has demonstrated a right to pre-judgment interest on past damages

18

19   [202] ECF 48, 57, 58.  The appeal was ultimately dismissed because the challenged order was not final

20   and appealable.  ECF 89.

21   [203] These amounts consist of $861,675 in past pain and suffering, $965,000 in past medical expenses,

22   and $154,000 in past lost earnings.  ECF 318 at 2.

23   [204] ECF 335 at 2.  The jury returned its special verdict on August 27, 2014, but a clerk's judgment

     was entered the next day and amended a day later.  ECF 318, 321, 322.

24   [205] *Id.* at 335.

25

26   [206] ECF 344.  Although the jury awarded Thompson various future damages not computed in the pre-

     judgment interest amount, TRW seeks an offset for the full amount of the settlements without

27   suggesting that this amount should be apportioned between pre- and post-judgment amounts.

     Thompson, however, filed no reply to dispute this point, and I find no grounds to distinguish the

28   amount of the offset. Therefore, I apply the entire offset to past damages.

minus the equitable settlement offset.  Applying the pre-judgment interest calculation to the reduced past-damages amount of $1,305,675,[207] the prejudgment interest on $1,305,675 at a rate of 5.25% over 1,877 days = $352,505.42.

Thompson also requests an award of post-judgment interest on the entire amount of the judgment (including pre-judgment interest) from the date of judgment until satisfaction of the judgment.[208]  28 U.S.C. § 1961 provides for an award of post-judgment interest computed daily and compounded annually at the rate set by the Board of Governors of the Federal Reserve System.[209] "The purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant."[210]  Thus, postjudgment interest "is mandatory without regard to the elements of which that judgment is composed" and may encompass all aspects of the judgment, including amounts for damages, prejudgment interest, attorney's fees and costs.[211]  "Interest runs from the date that entitlement to [costs] is secured, rather than from the date that the exact quantity of [costs] is set."[212]  Thompson is entitled to post-judgment interest on the total amount of the amended judgment from August 28, 2014, until paid in full at the rate set in 28 U.S.C. § 1961.

## Conclusion

Accordingly, with good cause appearing and no reason for delay, it is HEREBY ORDERED, ADJUDGED, and DECREED that:

- •   TRW's Motion for Judgment as a Matter of Law or Motion for a New Trial **[ECF 339] is DENIED**.

---

[207] ECF 344.

[208] ECF 335.

[209] *See* ECF 335-4.

[210] *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 F.3d 827, 835-36 (1990).

[211] *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995).

[212] *Friend v. Kolodzieczak*, 72 F.3d 1386, 1391-92 (9th Cir. 1995).

1   •   TRW's **Objections** to Thompson's Bill of Costs **[ECF 341] are SUSTAINED in**

2   **part and OVERRULED in part,** resulting in the retaxing of Thompson's costs.

3   **Costs of $37,618.43 are taxed against TRW** and in favor of Thompson, and the

4   judgment will be amended to reflect this award of costs.

5   •   TRW's Motion to Alter or Amend Judgment **[ECF 336] is GRANTED.**  The

6   judgment will be further amended to provide TRW **a $675,000 offset**.

7   •   Thompson's Motion to Alter or Amend Judgment **[ECF 335] is GRANTED.**  The

8   judgment will be further amended to award Thompson **prejudgment interest of**

9   **$352,505.42** and **post-judgment interest** on the amended judgment amount below at

10   the rate set in 28 U.S.C. § 1961 from August 28, 2014, until the judgment is paid in

11   full.

12   IT IS FURTHER ORDERED that the Amended Judgment dated August 29, 2014, is further

13   amended to reflect the following **final judgment** entered in favor of Nicole Thompson and against

14   TRW Automotive U.S. LLC, in these amounts:

15   1.   Past mental, physical and/or emotional pain, suffering and disability, including the

16   impairment to the quality of life: $861,675.

17   2.   Future mental, physical, or emotional pain, suffering and disability, including the

18   impairment to the quality of life: $1,011,675.

19   3.   Past medical expenses: $965,000.

20   4.   Future medical expenses: $100,000.

21   5.   Past loss of earnings caused by the injuries sustained from the date of the accident

22   through the present: $154,000.

23   6.   Future loss of earning and/or earning capacity caused by the injuries sustained in the

24   accident: $132,650.

25   7.   Future non-medical and reasonably necessary expenses associated with disabilities

26   due to the injuries sustained: $75,000,[213]

27   _____

28   [213] Incorporated from ECF 318 at 2; ECF 322.

for total damages of    $3,350,000.00 (first amended judgment amount)

-     675,000.00 in equitable offsets

+     352,505.42 in prejudgment interest

+     <u>37,618.43</u> in costs

= **$3,065,123.85, which will accrue post-judgment interest** at the rate set by 28 U.S.C. § 1961 from August 28, 2014, until paid in full.

DATED: September 17, 2015.

Jennifer A. Dorsey
United States District Judge